ROBERT H. MILLER, Claimant and Appellant, *v.* SUND-
ANCE RECREATION, INC., Employer and HARTFORD
ACCIDENT and INDEMNITY COMPANY, INSURANCE
CARRIER, Defendants and Respondents.

No. 11419.
Decided May 24, 1968.
Rehearing Denied June 14, 1968.
441 P.2d 194.

J. H. McAlear (argued), Red Lodge, for appellant.

Crowley, Kilbourne, Haughey, Hanson & Gallagher, Billings,
Gareld F. Krieg (argued), Billings, for respondents.

MR. JUSTICE JOHN C. HARRISON, delivered the Opinion
of the Court.

The appellant brings this appeal from a judgment of the district court, after a hearing, affirming the findings of fact made by the Industrial Accident Board denying appellant's workmen's compensation claim.

The appellant filed a claim for workmen's compensation and medical benefits for a claimed disability occurring in the course of his employment as a general laborer for Sundance Recreation, Inc., of Red Lodge, Montana. Sundance Recreation, Inc., was insured under Plan II of the Workmen's Compensation Act of the State of Montana and the Hartford Accident and Indemnity Company is the insurance carrier.

Prior to October 22, 1966, the appellant had been employed as a handyman at the respondent's ski site and had, during his period of employment, done such work as: set fence posts, set up snow fences, and general cleanup of the premises. On October 22nd, the area was subjected to high winds that damaged the buildings and grounds and the appellant was engaged in cleaning up the damaged buildings. As part of his work he began sawing a 2x4. In the process of sawing the board he held it against his knee in a stooped awkward position, without the use of a sawhorse. Concerning his injury he testified that as he completed the sawing, the following took place:

"A. Well, I got it sawed off, and got a pain in the side of my head up here, I just felt as if I was going to fall, so I let myself sit on the ground for awhile, and then I went to get some nails to nail it up with, and after I sat there awhile and I was able to get up again, and as soon as I got inside the control house where the nails was I felt as if I was going to fall again, so I just sit down on the floor, just seemed to lose all sense of balance."

His fellow workmen found him in the building and realized he was either sick or injured, called an ambulance and had him taken to the Red Lodge hospital where he received emergency treatment from Dr. Karas. Upon examination and after

emergency treatment Dr. Karas had him transferred to St. Vincent's Hospital in Billings where he came under the care of Dr. Neil I. Meyer, a neurologist and brain surgeon. It was found that he had suffered an aneurysm of the right middle cerebral artery and it had ruptured.

Dr. Meyer when asked whether it was reasonably probable that the work caused the aneurysm, said:

"A. If I may expand a little bit to give a fuller answer to the question. As far as the pathology of aneurysms is concerned, the part that we are dealing with, the outpouching or the aneurysm itself is an extremely thin part of the blood vessel. This is why they very often rupture because they are thinner than the ordinary blood vessel. They are abnormal or pathological conditions. It is known that a fair number of these will rupture under stressful situations, situations that tend to make the blood pressure in the brain increase. In view of that it would seem very probable to me that Mr. Miller's physical exertion at the time just prior or shortly before he developed symptoms would be connected with the rupture of this aneurysm.

\*       \*       \*       \*       \*       \*       \*       \*

"A. The rupture of the aneurysm, I would say that is a good probability. One other thing I would like to add.

"Q. Yes.

"A. Is that it does not have to be the work preceding the rupture of the aneurysm by a second, it doesn't have to be simultaneous, it could have been work that he did 30 seconds ago, or 60 seconds ago, or three minutes ago before the symptoms start, there can be a little time delay."

In his direct examination Dr. Meyer discussed his opinion as to whether or not the aneurysm was congenital, as follows:

"A. The opinion, probably the opinion that all used to hold and the opinion that probably a good many hold now is that it is congenital. The opinion that I think most people hold who deal with aneurysms, this of course would let out

a fair percentage of medical practioners, is that they are degenerative in nature and not congenital.

"Q. Therefore, in lay language, is it true that insofar as this man is concerned that he had a weak spot in his arterial system? A. That is correct.

"Q. And is it true also, I believe you said that increased blood pressure entered into the picture of these aneurysms? A. Yes.

"Q. Is that true? A. That is true.

"Q. And if one were performing undue exertion or labor requiring undue exertion would that in all probability raise his blood pressure? A. I believe it would.

"Q. And is it or is it not the history of aneurysms or rather the rupture of them, that they are usually accompanied by a history of undue exertion, undue anger, undue excitement, or other things which might cause a rise in the blood pressure. A. That is correct.

"Q. And I believe that you, in reporting this to the Industrial Accident Board, did make the statement to the Board that in your opinion that there was a work connection. A. Yes, I did."

On cross-examination the doctor testified about the aneurysm, as follows:

"Q. Doctor, let me just clarify a couple points first. As I understand your testimony it is that the aneurysm first, itself, is not work-related. A. That is correct.

"Q. This is a developmental project that came long, or possible even congenital, but in any event it is not related at all to his work. A. The aneurysm itself, that is correct.

"Q. Now was there more than one aneurysm? A. We did not demonstrate more than one.

"Q. Can aneurysms also result from disease or some disease process. A. Yes, they can.

"Q. Is it the same type of aneurysm or is it a little different type of aneurysm? A. It's usually different.

"Q. You did see this aneurysm. A. Yes. What I mean by different is. aneurysms caused by disease usually occur in other parts of the body.

. "Q. I see. In any event, this aneurysm again was— A. Was a rather typical type that we see in the brain.

"Q. Whether it was congenital or developmental, in any event it didn't develop from anything that he was doing.

\*      \*      \*      \*      \*      \*      \*      \*

"Q. Now is it correct, Doctor, that these aneurysms may even rupture at rest? A. Yes, they may.

"Q. What actually causes the rupture of the aneurysm itself? A. I think what causes, well technically the cause of the rupture of the aneurysm is that the tissue containing the blood disrupts. It is my feeling that the disruption, well, the giving away of the tissue that is containing the blood is caused by a rise in the blood pressure inside the artery itself.

"Q. Well, but is this something that actually is a continuation perhaps of this developmental process that is going on, which gives rise to the aneurysm in the first place. A. No. I think I know what you are getting at. You mean is this the end point of the disease.

"Q. Yes. A. That's a hard question to answer because some people have aneurysms found at autopsy that never ruptured. Now would that mean that they haven't reached that end point yet?

"Q. That would be my next question to you, Doctor. A. Even if they are 75 or 80 years old, that they haven't reached that point? I don't know.

"Q. Well, Doctor, if he had, if Mr. Miller in this case had been doing, oh work at least as heavy as he was doing at the time this occurred within a day or two before, is it fair to assume that his blood pressure would be as high or higher a day or two before as at the time this occurred? A. It may have and it may not have.

\* . .      \*      \*      \*      \*      \*.    .    \*      \*

"Q. You are not suggesting in your testimony, I take it, that the exertion that he was putting forth in his job at that time was unusual for that job. A. No.

"Q. You are saying simply that the exertion that he was doing at that time was undue for Mr. Miller, so that in your opinion it raised his blood pressure and did result in the rupture. A. Right. I am not making any statements about job description. May I make a statement?

"Q. Yes. A. I think in all fairness the problem boils down to the fact that we know aneurysms rupture when a patient is not on his job, when he is doing various sorts of activities, but I think it boils down to the fact that Mr. Miller's ruptured while he was working, and while he was at his job, and we know that aneurysms rupture under many circumstances where there is an increase in blood pressure and Mr. Miller was engaged in doing a job, which certainly could raise his blood pressure, therefore it leaves very little for me to surmise except to say that I can see pretty well the connection between his activity and the rupture of the aneurysm. I make no statement and I certainly deny that the work caused the aneurysm, we are talking just about the rupture   *   *   *."

When asked the length or period of time he felt that Mr. Miller had had the aneurysm, he answered as follows:

"Q. But there is no element of conjecture is there, that it had been present, oh, a matter of several months at least in the course of developing. A. I would think it would have to be longer.

"Q. It would have to be there before he started this employment then if he had only been working for a month or so with this employer? A. I would agree."

The testimony showed that Mr. Miller was in the hospital for a number of weeks and when discharged he had several clamps in his head. From the time he was discharged, he has been unable to do more than light work.

Upon these facts, both the Industrial Accident Board and

the district court found "That the sawing of this lumber did not require exertion beyond the usual demands of the claimant's employment, nor did he at any time on the day in question suffer a tangible happening of a traumatic nature from an unexpected cause." Accordingly the Industrial Accident Board and the district court concluded that the claimant's disability was not the result of an injury as defined by section 92-418, R.C.M.1947, as amended, and the claim for compensation should be dismissed.

The appellant sets forth several issues which we will combine into the following issues:

1. Is Robert M. Miller, claimant, entitled to workmen's compensation benefits under section 92-418, R.C.M.1947, as amended in 1961.

2. The district court's refusal to make and enter judgment in accordance with claimant's requested findings of fact and conclusions of law.

For the purpose of this appeal, it must be understood that section 92-418, R.C.M.1947, as amended by section 6, Chapter 162, Laws of 1961, is controlling. It defines injury as meaning "a tangible happening of a traumatic nature from an unexpected cause, resulting from either external or internal physical harm, and such physical condition as a result therefrom and excluding disease not traceable to injury."

This court has been called upon in several cases to interpret the meaning of this amendment as it concerns "unexpected cause" and "injury." In the case of Lupien v. Montana Record Publishing Company, 143 Mont. 415, 390 P.2d 455 (1964), the court, reversing a district court holding, held that a workman who had worked unusually hard the previous day in getting out a large newspaper and worked hard the day of this heart attack, saying, "Even so, accepting the district court's version of the record, the 'tangible happening of a traumatic nature from an unexpected cause' was not present. Everything done by Lupien was expected of him and by him. It was his work

to do just as he was doing and in the varying degrees just as he had been doing for some twenty-seven years.

"We think without going further that on its face the statute does not cover the death of Lupien. However, we should point out too that under the medical testimony as found by the Board, and as fairly gleaned from all of the medical opinions before the district court that there was no 'external or internal physical harm' since it was shown that the myocardial infarct stemmed from a progressive disease of the arteries—arteriosclerosis. We shall not develop this point further, however, because of our ruling that no injury resulting from a tangible happening of a traumatic nature from an unexpected cause was shown."

The same could be said in this case as it concerns Mr. Miller's aneurysm. Here the appellant tries to make much of the position he was in when he sawed the board and the fact that it was cold and windy, in attempting to set up a fact situation that would bring the injury under the amended provision of "tangible happening of a traumatic nature from an unexpected cause."

In view of Lupien, the test is whether or not there was something unusual or out of the ordinary (unexpected) as it pertained to the performance of the task which brought about an unexpected result of disability. As this Court said in Lupien concerning "cardiac cases," they might be compensable under our own statute under other situations or different circumstances, so might we say concerning "aneurysms" if they were produced by suddent severe physical strain which was unusual or unexpected to the task involved.

Subsequently a majority of this Court, in a back strain case, followed the theory set forth in Lupien as to what constitutes "injury." James v. V.K.V. Lumber Co., 145 Mont. 466, 401 P.2d 282.

Under the decisions of this court established in the Lupien and James cases, neither the Industrial Accident Board

nor the district court could have properly come to any other conclusion than that Mr. Miller suffered no "injury" as defined in section 92-418, R.C.M.1947.

In view of our holding on the principal issue set forth in the appeal we find no necessity to consider other factors raised by the appellant.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES AAIR and CASTLES, concur.

MR. JUSTICE HASWELL (specially concurring).

I concur in the result but not all that is said in the majority opinion.

The majority opinion deals at length with the cause of the aneurysm which, in my view, has nothing whatever to do with the result in this case. Whatever the cause of the aneurysm may be, if it ruptured by reason of "a tangible happening of a traumatic nature from an unexpected cause" connected with employment it is a compensable injury (section 92-418, R.C.M.1947, as amended by Ch. 162, Laws of 1961); conversely if the rupture was not so caused, the injury is not compensable.

In the instant case there is no "unexpected cause" of the tangible happening of a traumatic nature. An unexpected result of the employee's ordinary activities in performing his employment is insufficient under the 1961 amendment defining injury for the reasons set forth in the majority opinion in Lupien v. Montana Record Publishing Co., 143 Mont. 415, 390 P.2d 455. (Also see James v. V.K.V. Lumber Co., 145 Mont. 466, 401 P.2d 282.)

In my opinion, the foregoing is the specific and correct basis for the result reached by the majority.